# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1028

_____

Lincoln Provision, Inc.

*Plaintiff - Appellee*

v.

Aron Puretz

*Defendant - Appellant*

PMP, LLC

*Defendant*

Hastings Acquisition, LLC, nominal *defendant*

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: October 6, 2014
Filed: January 5, 2015

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Aron Puretz and Hastings Acquisition, LLC (Hastings), appeal from the district court's[1] order awarding Lincoln Provision, Inc. (Lincoln), $880,000 plus interest as fair value for Lincoln's ownership interest in Hastings. We reverse and remand.

In March 2010, Lincoln, an Illinois meat-packing company seeking to cut production costs, and Puretz, a New York real-estate investor, formed Hastings as an Illinois member-managed limited liability company (LLC) for the purpose of bidding on two Nebraska cattle-processing plants that were being sold at a bankruptcy auction. Lincoln and Puretz agreed that Puretz would contribute 70% of the acquisition and start-up capital required for their joint venture and that Lincoln would contribute 30%. To account for the disproportionate capital contributions, Lincoln agreed to manage the plants and to provide roughly 40,000 head of cattle per year to be processed at the plants.

Later in March 2010, Hastings filed standard form Illinois Articles of Organization, Article 7 of which requires an LLC to state whether it is to be managed by its members or by a manager. The Hastings Articles state, "The Limited Liability Company has management vested in the member(s)," and then list Lincoln and Puretz as the company's two members. The Illinois standard form Articles did not require Hastings to disclose other details about the company's financing or operations. Lincoln and Puretz intended to set out these details in the company's operating agreement once they had agreed on the various terms.

To bid on the cattle-processing plants in the upcoming bankruptcy auction, Hastings was required to make an initial earnest-money deposit of $250,000 to an escrow account. Puretz contributed $150,000 and Lincoln contributed $100,000 to

---

[1]The parties agreed to submit the case to a magistrate judge under 28 U.S.C. § 636(c); hereafter, we refer to the magistrate judge as the district court.

the total amount. Hastings thereafter submitted a successful bid of $3,900,000 for the two plants.

Meanwhile, negotiations between Lincoln and Puretz regarding the future operation and ongoing financing of Hastings began to deteriorate, and the members were unable to settle on terms for the company's operating agreement. Although Lincoln, Puretz, and their respective attorneys exchanged numerous emails and draft operating agreements, they could not agree on several major issues, including the members' respective shares of profits and losses, authority for day-to-day management decisions, and the procedures for calculating the value of the members' respective ownership interests in the company. The members met on June 21, 2010, in a final attempt to resolve their differences. Notes prepared to summarize the discussions at this meeting describe the issues upon which the members apparently agreed, including that the members' capital contributions would be repaid in full before the company's profits and losses were divided equally between the members.

After several delays, Hastings finally closed on the purchase of the plants on June 30, 2010. Because of the members' inability to resolve their disagreements about the financing and operations of the company, Lincoln refused to contribute its agreed-upon 30% of the purchase price for the plants. Puretz was therefore required to pay the entire $3,900,000 purchase price, except for the $100,000 from Lincoln's contribution to the escrow account that was credited to the purchase price.

On July 2, 2010, Lincoln's attorney sent a letter to Puretz's attorney stating that Lincoln was dissociating from Hastings. Under the Illinois Limited Liability Company Act (the Act), 805 Ill. Comp. Stat. §§ 180/1-1 to 180/60-1, if a member of an LLC dissociates and the LLC does not dissolve, the LLC is required to purchase the dissociating member's distributional interest under the terms agreed to by the LLC's members. Ill. Comp. Stat. § 180/35-60(a). If the LLC does not purchase that interest as required, the dissociating member may file suit against the LLC, and a

-3-

court then determines the fair value of the dissociating member's distributional interest in the LLC. Id. § 180/35-60(d)-(e). As noted above, Lincoln and Puretz had never executed an operating agreement that described the method for calculating the value of a member's ownership interest in Hastings. Therefore, invoking federal diversity jurisdiction, Lincoln filed this lawsuit against Hastings seeking a determination of the fair value of its interest in the company.[2]

The district court held a four-day bench trial. Lincoln argued that the fair value of its distributional interest in Hastings was "half the value of Hastings," while Hastings argued that the fair value of Lincoln's distributional interest was "$100,000—the amount [Lincoln] contributed to the acquisition of the [p]lants." The district court found that "[Lincoln] and Puretz each h[e]ld a 50% interest in Hastings," that Lincoln dissociated from Hastings on July 2, 2010, and that the value of Hastings on the dissociation date was $3,900,000—the amount paid for the plants in the bankruptcy auction. The district court also found that, because the plants were never operational and Lincoln never provided management services or cattle for processing, Lincoln's only contribution to Hastings was the $100,000 it contributed to the escrow account. In reaching this conclusion, the district court rejected Lincoln's assertions that its identification of the business opportunity, guidance in the bidding process, development of a business plan, and general "sweat equity" had "substantial value" for which it should receive credit.

Based on these findings, the district court first acknowledged that awarding Lincoln its requested relief—50% of the $3,900,000 total value of Hastings—when Lincoln failed to contribute the capital, management services, and cattle it agreed to contribute "would result in an inequitable windfall" to Lincoln. Nevertheless, the

---

[2]Lincoln also sued Puretz individually, but those claims were dismissed, and Lincoln does not challenge that decision on appeal. PMP, LLC, also named as a defendant, is actually named PKMP Co., LLC, a Nebraska LLC formed by Puretz that was never served and was not involved in the lawsuit.

district court ultimately concluded that the fair value of Lincoln's distributional interest in Hastings was 50% of the $3,900,000 value of the company ($1,950,000), less the 30% of the $3,900,000 purchase price that Lincoln failed to contribute at closing ($1,170,000), plus a return of the $100,000 Lincoln contributed to the escrow account. The district court therefore entered an order awarding Lincoln $880,000 plus interest from the July 2, 2010, date of Lincoln's dissociation.

Hastings filed a motion to correct the judgment and findings of fact, contending, among other things, that the district court had failed to give effect to the members' understanding that capital would be returned in proportion to the members' respective contributions before profits and losses were divided equally. The district court denied the motion, concluding that the "evidence d[id] not support a finding that the parties agreed that capital contributions would be returned in the proportion of the parties' respective contributions before distribution of profits" and that its "valuation of [Lincoln's] distributional interest was proper and consistent with the Act and the evidence presented." Hastings now appeals, arguing that the district court erred in determining the fair value of Lincoln's distributional interest, in refusing to consider Hastings's state-law defenses, and in calculating the date of Lincoln's dissociation from Hastings.

"[W]e review the district court's fact finding for clear error, and we review legal conclusions and mixed questions of law and fact de novo." Eckert v. Titan Tire Corp., 514 F.3d 801, 804 (8th Cir. 2008). "[W]e will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." Richardson v. Sugg, 448 F.3d 1046, 1052 (8th Cir. 2006). Hastings contends that determination of the fair value of Lincoln's distributional interest is a mixed question of law and fact subject to *de novo* review, and Lincoln contends that the determination is a finding of fact subject to review for clear error. We need not decide which standard applies, because even if reviewed under the more

rigorous clear-error standard, the district court's determination of the fair value of Lincoln's distributional interest in Hastings was mistaken.[3]

Under the Act, once a dissociating member files suit seeking a judicial determination of the fair value of his distributional interest, the court must calculate the fair value of the interest after taking into account all "relevant evidence," including, for example, the value of the LLC as a going concern and any agreement between the members fixing the price or specifying a formula for calculating the price of a distributional interest in the LLC. See 805 Ill. Comp. Stat. § 180/35-65(a). An LLC's operating agreement "govern[s] relations among the members," but "[t]o the extent the operating agreement does not otherwise provide, [the] Act governs" those relations. Id. § 180/15-5. In addition, "principles of law and equity supplement [the] Act." Id. § 180/1-43.

According to the district court, because the "evidence show[ed] that [Lincoln] had a 50% interest in Hastings," Lincoln was entitled to 50% of the value of Hastings after an adjustment for Lincoln's 30% capital-contribution shortfall and its $100,000 contribution to escrow. Hastings argues that contrary to this determination, the evidence supported a conclusion that the members agreed to a proportional return of capital prior to any distribution of profits and losses, even though they never finalized an operating agreement. We agree. The evidence at trial clearly established that the members contemplated a proportional return of capital actually contributed and that any "50% interest" Lincoln had was limited to distributions of profits and losses after the proportional return of capital contributions. Of course, because Lincoln refused

_____

[3]Because we agree with Hastings that the district court erred in calculating the value of Lincoln's distributional interest in the company and because we grant Hastings's request for relief in the form of a remand with "instruction[s] to value [Lincoln's] distributional interest at $100,000," we need not consider Hastings's other arguments on appeal.

to make its initial 30% contribution to capital, Puretz actually contributed 100% of the capital to Hastings, less Lincoln's $100,000 payment to the escrow account.

Jim Stevens, Jr., Lincoln's president, confirmed that the members "agreed to all" the terms described in the notes from the June 2010 meeting, including that "cash put in to funding the operation will be paid back prior to the 50-50 profit split." One of Lincoln's key employees, who was also present at the June 2010 meeting, confirmed that this was the members' understanding, testifying, "[M]oney was coming in 70/30, then that was going to be paid out that same way until they got their investment back . . . . So [Puretz] got [his] 70 percent back before it was 50/50 split."[4] In an email to Lincoln's attorney after the June 2010 meeting, Hastings's attorney sought confirmation that the members agreed that profits and losses would be divided "after return of the funds" contributed to capital. In response, Lincoln's attorney confirmed that understanding, stating that the agreement was that "[i]nvested capital, without interest, was to be returned 70/30 as invested." The proposed operating agreement drafted by Lincoln's own attorney stated that if the company was dissolved, "any capital invested in cash and not previously returned . . . to acquire the assets shall be refunded in the same proportions of [70/30], respectively invested," and that only "[a]fter all capital has been returned in the amount originally invested" would funds from operations or upon liquidation "be paid on a 50/50 basis." Indeed, in Lincoln's July 2, 2010, dissociation letter, Lincoln's attorney demands "the value of [Lincoln's] equity" in Hastings and states that "the equity Lincoln is owed . . . . is

---

[4]The testimony at trial often referred to the members' original understanding that there would be a 70/30 proportional return of capital contributions prior to an equal division of profits and losses. This return of capital would have been appropriate had Lincoln made its initial 30% contribution to capital as originally contemplated by the members. Instead, because Lincoln ultimately refused to make its 30% contribution and Puretz was required to contribute 100% of the capital to Hastings, Lincoln is not entitled to a distribution of 30% of Hastings's capital.

half the value of the company less the debt, after return of capital to both investors." This evidence establishes that the members understood that their respective capital contributions would be returned in the amount actually contributed before profits and losses were divided equally. Perhaps most importantly, Lincoln presented no evidence indicating that Puretz agreed to contribute 70% of the capital to Hastings in exchange for the right to receive only 50% of the capital in repayment of his investment. The evidence does not support such a conclusion.

Lincoln argues that the district court correctly relied on Article 7 of the Hastings Articles of Organization as the best evidence that each member had a "50% interest in Hastings" for all purposes—including for purposes of calculating the fair value of a member's distributional interest. We disagree. The Articles merely establish that Hastings was to be formed as a member-managed LLC and that management was to be vested in its two members, Lincoln and Puretz. The Articles cannot be read to establish the members' economic interests in the company. Lincoln also argues that it contributed the business plan upon which the joint venture was based and that this plan, along with its "sweat equity" and other non-monetary contributions, were valuable assets entitling Lincoln to 50% of the value of Hastings. Again, we disagree. The district court did not clearly err in assigning no value to the business plan, to Lincoln's "sweat equity," or to its unperformed promises of management services and cattle for processing—particularly given that Hastings was never operational. The district court properly found that Lincoln's only contribution to Hastings was the $100,000 deposited in the escrow account.

Considering the evidence outlined above—as well as the absence of any evidence to the contrary—we conclude that the district court clearly erred in finding that "the evidence [did] not support" a determination that the parties agreed to a proportional return of capital contributions. The evidence presented at trial established that Lincoln and Puretz contemplated that any capital they contributed to Hastings would be returned to them in proportion to their respective contributions

-8-

before any profits or losses generated by the company's operations were divided equally. Because Lincoln did not make its agreed-upon 30% contribution to capital, it was not entitled to a 30% distribution. The evidence presented at trial also established that Lincoln's only contribution to Hastings was its $100,000 deposit in the escrow account. Thus, the district court's valuation determination was not supported by substantial evidence, and we are "left with the definite and firm conviction that an error was made." <u>Richardson</u>, 448 F.3d at 1052. We therefore reverse the judgment of the district court awarding Lincoln $880,000 plus interest, and we remand with instructions to enter an order awarding Lincoln $100,000 plus interest from the July 2, 2010, date of Lincoln's dissociation from Hastings.

_____